Argument was heard by Judge Barrett, in the supreme court, Chambers, upon the order requiring the inspectors of the thirty-second election district of the twenty-second as *786 sembly district, where 1,017 citizens are registered, to show cause why a mandamus should not issue commanding them to receive the votes of all registered electors who are present and ready to vote at four o’clock on election day.
The application was by the special committee, appointed by the Tammany Hall organization, to protect the interests of voters in the coming election. The entire committee was present and consisted of Nelson J. Smith, Alfred Steckler, Louis E. Waehner, John GS-. H. Meyers, Alexander Thain, Joseph J. Marrin, Leicester Holme and Peter Mitchell.
Mr. Smith first addressed the court. He explained the condition of affairs in the district. He said that he appeared in the interest of the public, because every citizen of the government was or should be concerned in having their rights protected. The legislature, he thought, certainly intended to promote the right of suffrage and not to deprive citizens of that right. If there is any restriction, we ask that it shall be swept away and the citizen not be prohibited by inadequate legislation from exercising his franchise without molestation.
Mr. Smith cited Cooley’s constitutional work, where he holds that the right of the citizen in this respect must not be impeded. If the circumstances of which we have spoken arise, continued Mr. Smith, these rights, which are given to every citizen by the constitution of the State and United States, must not be denied him under the guise of protecting them. Any citizen may make application to protect this right, and it is not required that he shall wait until the right is refused him, because at that time such an application would be futile. Such a step would be a mere idle ceremony and entirely useless. In this case the inspectors have announced emphatically that they will not receive votes after four o’clock on election day. These inspectors, said Mr. Smith, should not be placed in jeopardy by being compelled to refuse votes of electors who were present and ready to vote at four o’clock. If they refused to receive votes when they ought to do so, they would be guilty of a crime, and if they accepted ballots when they had not the right to do so, they would be guilty of a crime.
“ Then you admit,” said Judge Barrett, “ that the law is constitutional; but as an emergency has arisen, you wish the court to provide a remedy. The law has provided that voting shall be from 6 A. m. to 4 p. m , and it is stringent. It becomes unconstitutional at four o’clock as to the gentlemen in line.”
Mr. Smith replied that if the provision was such as to destroy a right, it should be swept away by the court.
*787 Joseph J. Marrin, the next speaker, claimed that the judge had the power to invent a remedy if necessary. He believed that the power of the court was as great as that of the legislature, and that by the constitution, the judiciary was made the interpreter of the legislative act. In this court, said he, resides the power to construe the law. He claimed that the polls were not alone the ballot boxes, but the room and the whole environment of the polling place.
Peter Mitchell was heard on the constitutional question. He read from the national and state constitutions the sections providing that no rights of citizens should be abridged. Then he quoted from the election law the section providing that all persons whose names are duly registered are entitled to vote on election day. If the statutory law was at variance with the constitution, then the statute must give way or be declared unconstitutional. If a person were in line at four o’ clock, he had exercised due diligence, within the meaning of the law, and was entitled to vote. Nowhere, said Mr. Mitchell, would any word or law be found to take away this right. It was the duty of his honor, under oath, to remedy the matter and, if necessary, to declare the restrictive legislation unconstitutional.
Alexander Thain, on behalf of two of the inspectors, said that they were anxious to be instructed by the court.
Colonel George Bliss then spoke. He said that he represented himself and spoke as a citizen. The colonel said: “ I hope your honer will not undertake on this one-sided application, where there is no defendant, to declare this law unconstitutional. ” He said that the applicants had said thousands of electors would be deprived of their right unless the mandamus was granted. In one district only are over 1,000 persons registered. In several other districts the number exceeds 600. On previous occasions over 600 votes have been received at a polling place, and in one instance over 800 were taken. The inspectors, I believe, are able to receive the vote in the district mentioned. At a recent test by the police department they put through four persons in one minute.
Mr. Louis H. Waehner asked what right the police had to make the test. To which Colonel Bliss replied: “Do you question the right of the police to assist in the election? The law requires the attendance of the police at the polls.”
Then the colonel proceeded to say that the law regarding the closing of the polls was mandatory, and meant that the receiving of votes should cease at four o’clock, and then the counting of the votes continued from that time without cessation until completed.
Colonel Bliss sat down, and when asked by Mr. Marrin to say whether he favored or opposed the application, remained *788 silent. Mr. Marrin remarked-. “There is no use asking; we get nothing but silence.”
“I am not afraid to speak; I am a republican and I oppose this application,” replied the colonel.
After further argument Judge Barrett said that in view of the importance of the matter he would decide it immediately. Accordingly he denied the application orally.
The following is Judge Barrett’s decision in full:
Barrett, J.—In view of the importance of this matter and the fact that the election is to occur at an early day, I think the question should he disposed of now.
I do not wish, however, to be understood as treating it lightly. On the contrary, it has received thoughtful and solicitous consideration, not only from, me, but from all the judges of the court who were accessible. We have examined the statutes and the authorities, knowing that it was ■a matter of grave public interest, to the end that we might be well prepared for any discussion which might arise.
I have listened attentively to the views of counsel, but nothing has been suggested which renders it necessary to defer our judgment, or which calls for further consultation and consideration.
I entirely agree with the gentlemen who appear for the relators, that the constitution guarantees to every citizen possessed of the requisite qualifications the right to vote at a general election. At the same time that right cannot be practically enjoyed except, through the instrumentality of legislation. In other words, if the legislature had provided no machinery for the exercise of the right it could not be enjoyed, for there is no provision in the constitution for such machinery. The latter devolves upon the legislature.
Express provision is made in the constitution for such legislation. The legislature is therein required “to pass general laws for the opening and conduction of elections and the designating of places for voting.” Thus the enjoyment of the undoubted right which the citizen possesses practically depends upon the performance by the legislature of its constitutional duty. There is, however, no suggestion that the legislature has not performed that duty and performed it fairly—no intimation that its course has been revolutionary in the sense of disregarding the constitional mandate.
The law under consideration has been in force for many years. So far it has worked well and has proved adequate for the citizens’ constitutional guarantee. The present complaint is that the law may be found to be in some respects inadequate at the coming election, owing to unusual and extraordinary conditions; that thus it has become pro tanto unconstitutional.
*789 That is a proposition which cannot for a moment be sustained. But if it were to be treated as unconstitutional, upon the happening of the particular event, and solely because of, and with relation to, such happening, what then ? The proposition is substainally advanced that the court shall remedy the then inadequate legislation and see that the constitutional guarantee is afforded the citizen by extending the hour of closing provided by the legislature to a later hour to be specified by the court, and suitably flexible to meet all possible exigencies. It is plain that that would be usurpation of the legislative power. That body alone can, under the constitution, regulate the time for the opening and closing of the polls.
If there was no election law at all, the court could not direct that ballot boxes be placed at" some convenient locality, or otherwise execute the constitutional guarantee by providing (through mandamus against local officers) adequate machinery. If the legislature, in the exercise of its exclusive power under the constitution, makes inadequate provision, that is a matter for which legislators, and legislators alone, must be held responsible at the bar of public opinion, just as other public servants who neglect their sworn duties are held responsible. Passing from the constitutional view of the subject, let us look at the act itself. The question is not whether, in case the polls be kept open and votes are polled after four o’ clock, the election is void. The real question is whether we shall direct (by mandamus) the inspectors to do what the legislature has said that they shall not do. It is immaterial for the solution of so plain a question whether the act is directory or mandatory. We would no more require the inspectors to violate a directory law than a mandatory law. It is, however, my clear opinion, and also the opinion of at least four of my brethren, that the act is mandatory.
In the case of the People v. Cook, 4 Selden, 92, the statute there under consideration required the poll to be opened at sunrise and to be kept open until the setting of the sun. The only mandate there was that it should be kept open until the setting of the sun, not that it should be closed then. The learned judge, Willard, J., says: “The statute contains no words forbidding the poll to be held open after sundown.” Here, however, our statute expressly provides that the polls shall be opened at six in the morning and closed at four in the afternoon. This is an express mandate, and it is impossible for any candid mind to examine the context without seeing that such mandate was the plain intention of the legislature.
The act had a double purpose. It looks first to a fair polling of the vote, and, second, to a fair canvass of the *790 vote polled. One is deemed as important a function as the other, and the time is regulated with a view to both. From six to four the polling is to proceed. At four it is to stop, and the great work of canvassing is forthwith to proceed. To the latter, the remainder of the day is given. If we shall attempt to alter one part of the working of the act, we alter the entire, homogeneous system and frustrate the legislative purpose. The law and its working would thus be deprived of its harmony, its vigor and its vitality, as a system.
It is perfectly clear to my mind that the closing of the poll means not the closing of the polling place, but of the polling of votes. Several considerations make this entirely certain, in the first place, the polling place cannot be meant, because the law declares (sec. 1,885) that the polling place shall never be closed. There must be egress and ingress at the open door at all times, from six in the morning until the completion of the canvass. Again (sec. 1,882), provides that in each election district ■ it shall be the duty of the inspectors “to immediately after the closing of the polls on the day of any election, before proceeding with the canvass, * * * to write in ink opposite to and against the name of persons who have not voted, the word no.” Thus the close of the polls must mean the close of the polling of votes, for it is then, and then immediately, that the inspectors must make their entry of the word “no,” against the names of those who have not voted. Still further, we find that immediately after the closing of the poll (sec. 1885), the canvass shall commence, and “ such canvass shall not be adjourned or postponed until it shall have been fully completed.”
For a willful neglect of any of these duties the legislature had provided that the inspectors shall be adjudged guilty of a felony, and punished by imprisonment for not less than one nor more than five years (sec. 1,909). Of course, therefore, we cannot direct the inspectors to neglect the plain duty of closing the polls at four, registering immediately by the entry “no” those who have not voted at that hour, and proceeding forthwith to canvass. The only question of serious moment is that so ably discussed by Mr. Mitchell. I concede its gravity. It is a very grave suggestion that under the working of a law which has so far proved adequate, a citizen may possibly be deprived of his constitutional right to vote. Such a catastrophe should be averted by every; possible effort. If a law of this kind is unconstitutional in whole or in part, we can so declare, but we cannot put another law in its place. As I said before, the legislature must be appealed to to do its full duty by the people, and if the wrong which the relators suspect should be done, subsequent legislation will doubtless render it exceptional and impossible of repetition. There is something worse even than the possibility of a citizen losing his vote, and that is the prevention of that wrong by judicial usurpation or by the action of ministerial officers in evading *791 the law as it was plainly written and as it was also plainly intended to be understood.
There is also the danger of vitiating the election. Even in The People v. Cook (supra), where, as we have seen, the law was directory, Willard, J., said: “I do not intend to assert that there may not be departures from the statutory requirement with respect to the time of opening and closing the polls which would put in hazard the whole vote of the district.” Patriotism requires that no such question should be given even the semblance of life.
lío matter how much present excitement and interest may stir the public, the learned counsel for the relators are entirely right in asking our calm judgment. That judgment is that the inspectors cannot be too guarded in following the law as we have interpreted it, both for their own safety and honor, but also in truth for the public good.
The motion must be denied.